UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA            **SENTENCING**
                               :            **SUBMISSION**

        - v. -
                               :

IGNACIO LEAL GARCIA,                S1 04 Cr. 446-42 (TFH)
        a/k/a "Tuerto Camilo,"     :

            Defendant.         :

- - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - - x

## SENTENCING SUBMISSION OF
## THE UNITED STATES OF AMERICA

RANDALL W. JACKSON
JASON B. SMITH
Special Assistant United States Attorneys,
Of Counsel

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA  :  **SENTENCING**
: **SUBMISSION**
    - v. -
:
IGNACIO LEAL GARCIA,  :  S1 04 Cr. 446-42 (TFH)
    a/k/a "Tuerto Camilo,"  :

    Defendant.  :

- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - x

    The Government respectfully submits this memorandum in advance of the sentencing of defendant Ignacio Leal Garcia, scheduled for September 17, 2011. On November 10, 2011, the United States Probation Department released a final Presentence Investigation Report (the "PSR") for Leal Garcia. Leal Garcia has noted four legal objections to the PSR.[1] Specifically, Leal Garcia objects to the PSR's findings that he was a leader of the charged conspiracy, that the conspiracy involved the use of weapons, that the conspiracy involved more than 150 kilograms of cocaine, and that he is responsible for the use of minors. For the reasons described below, the Court should reject Leal Garcia's arguments on these issues and adopt the findings of the Probation Department.

## BACKGROUND[2]

    From at least the late 1990s until his capture in 2009, Ignacio Leal Garcia was part of the leadership of the 10th Front of the FARC. (PSR ¶ 19).[3] For a significant portion of that time, Leal Garcia served as the *Financiero* or Chief Financial Officer of the Front. (PSR ¶ 19). In that capacity, Leal Garcia was in charge of all of the Front's financial dealings, including purchasing explosives, weapons and supplies. (PSR ¶ 20). His most significant business activity as *Financiero* was managing all aspects of the 10th Front's expansive cocaine manufacturing and exportation business. (PSR ¶ 20). In that role, Leal Garcia supervised a number of men that he

---

[1] The defendant has also made several minor factual objections that are either indisputable, uncontested or insignificant to the determination of any issues at sentencing.

[2] This submission assumes familiarity with the broader background of this case, as described in the Government's prior submissions, the testimony at trial, and the PSR.

[3] "PSR" refers to the final November 10, 2011 Presentence Investigation Report; "Tr." refers to the transcript of trial which began on April 4, 2011; "GX" refers to the Government's exhibits admitted at the trial.

sent to all of the villages in the Arauca region of Colombia to collect coca base. (PSR ¶ 20). Leal Garcia supervised the aggregation of this cocaine base and its processing into cocaine hydrochloride at large jungle laboratories under Leal Garcia's control. (PSR ¶¶ 20-21). He traveled through the region under the protection of six to eight bodyguards at all times. (PSR ¶ 20). Leal Garcia also carried his own assault rifle. (PSR ¶ 20). After the cocaine was processed, Leal Garcia arranged for the cocaine to be transferred to various narcotics traffickers in Colombia and Venezuela, who then transported the cocaine to locations in Europe, Mexico and the United States. (PSR ¶¶ 20-21). During the times that he served as *Financiero*, Leal Garcia maintained control of narcotics in the Arauca region by threatening death to any who refused to cooperate with the FARC's control of cocaine trafficking. (PSR ¶ 23).

## PROCEDURAL HISTORY

The Government filed Superseding Indictment S1 04 CR 446 (TFH), which was returned by a grand jury in the District of Colombia, on March 1, 2006. (PSR ¶ 1). Count One, the sole count of the Indictment, charged Leal Garcia and other members of the leadership of the FARC with conspiring to manufacture and distribute 5 kilograms and more of cocaine, with knowledge that some of the cocaine would later be imported into the United States, in violation of 21 U.S.C. §§ 963, 959(a), and 960. (PSR ¶¶ 1-2).

On September 1, 2011, after a three-week trial, a jury found Leal Garcia guilty of the charge in the Indictment.

## GUIDELINES CALCULATION

U.S.S.G § 2D1.1 (a)(3) is the guideline applicable to the instant offense. The conspiracy involved the distribution of over 150 kilograms of cocaine. Therefore, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), the base offense level for Leal Garcia is 38. (PSR ¶ 34).

Leal Garcia's offense level is increased by four levels, pursuant to U.S.S.G. §3B1.1(a), because of his role in the offense. (PSR ¶ 38). Leal Garcia was a leader of the conspiracy and the conspiracy involved more than five participants. (PSR ¶ 38). The conspiracy also involved the use of firearms, including the defendant's personal use of a firearm and acquisition of weapons. (PSR ¶ 37). This results in a two-level increase in the defendant's offense level. (PSR ¶ 35). The conspiracy also involved the use of minors, including the defendant's personal supervision of minors in the Tenth Front. (PSR ¶ 37). This results in a two-level increase in the defendant's offense level. (PSR ¶ 35). The applicable total offense level for Leal Garcia is therefore level 46, three levels above the maximum offense level, rendering an effective offense level of 43. (PSR ¶ 43).

The defendant's Criminal History Category is I. (PSR ¶ 46). The applicable Guidelines range is therefore life imprisonment. (PSR ¶ 71). A mandatory minimum term of 10 years' imprisonment applies. (PSR ¶ 70). The United States has provided assurances to the Colombian government that it will not seek a life sentence, pursuant to the terms of Leal Garcia's extradition.

# APPLICABLE LAW

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court subsequently stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). *Gall* v. *United States*, 128 S. Ct. at 597.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 128 S. Ct. at 597 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. at 594. *See also Rita* v. *United States*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall* v. *United States*, 126 S. Ct. at 597.

## DISCUSSION

### A. Quantity Determination

#### 1. Applicable Law

Pursuant to U.S.S.G. § 1B1.3, a defendant is responsible at sentencing for "all acts and omissions committed, aided, abetted . . . or willfully caused by the defendant," and "in the case of jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Under U.S.S.G. § 2D1.1(a)(5) and (c)(1), the base offense level is 38 where more that 150 kilograms of cocaine are involved in the offense.

#### 2. The Relevant Quantity of Cocaine is More than 150 Kilograms

It is undisputed that the FARC's cocaine trafficking conspiracy, of which the defendant was a member, involved the distribution of thousands of kilograms of cocaine throughout the world. Leal Garcia argues, however, that only the cocaine specifically designated for the United States should be considered in calculating his offense level, and that there was insufficient evidence regarding these amounts. First, this argument is legally incorrect, as Section 1B1.3 suggests that all amounts of cocaine involved in the conspiracy should be considered relevant in calculating the appropriate offense level. *Cf. United States* v. *Young*, 609 F.3d 348, 357-59 (4th Cir. 2010) (noting that "'[r]elevant conduct' under the Guidelines, of course, often includes a broader range of conduct than the conduct underlying the offense of conviction" and affirming district court's inclusion of acquitted conduct in calculating appropriate amount of cocaine to be considered in calculating offense level). It would be a perversion of the intent of the narcotics sections of the Guidelines to disregard thousands of kilograms of cocaine involved in the conduct underlying the Indictment, but not specifically designated for shipment to the United States. This is particularly true given that the ultimate destination of much of the cocaine involved in the broader conspiracy is unknown.

Regardless, the amount of cocaine destined for importation into the United States easily exceeded 150 kilograms, and the Court can rely on two areas of evidence to make this determination. First, expert witness Mark Eiler testified that the vast majority of cocaine exported out of Colombia, including the regions in which Leal Garcia operated, is ultimately sent to the United States. (8/16/11 Aft. Tr. at 36-37). Eiler also testified that the United States is the single largest market for cocaine in the world, consuming approximately 300 metric tons of cocaine annually. (8/16/11 Aft. Tr. at 37). Second, multiple witnesses testified that the conspiracy was dealing in hundreds of kilograms of cocaine on a regular basis and that the ultimate destination for much of this cocaine was the United States. *See, e.g.,* 8/17/11 Aft. Tr. at 59 (testimony of Jose Cruz that he observed defendant regularly in process of collecting 500 kilograms of cocaine); 8/17/11 Aft. Tr. at 70-71 (testimony of Jose Cruz that, during time period where Leal Garcia was *Financiero*, he saw 1000 kilograms of cocaine being moved); 8/22/11 Aft. Tr. at 73-75 (testimony of Roberto Melendez that he transported 30 kilograms personally handed to him by Leal Garcia on eight or nine occasions); 8/24/11 Aft. Tr. at 31 (testimony of Yon Garzon Garzon that he witnessed departure of

87 flights each containing 300-350 kilograms of cocaine supplied by Leal Garcia and his coconspirators in the FARC); 8/24/11 Aft. Tr. at 40-43 (testimony of Yon Garzon Garzon that in undercover capacity, he learned major routes of cocaine supplied by Leal Garcia included route through Haiti to the United States and route through Venezuela and Spain to the United States; Garzon Garzon testimony that he witnessed delivery of millions in U.S. currency to Leal Garcia); 8/30/11 Morn. Tr. at 50-51 (testimony of Adolfo Sanchez that he participated in conversations with Leal Garcia in which Leal Garcia stated that the ultimate destinations of the cocaine were Europe, Mexico and the United States). As all of this testimony makes clear, it is not even a close question as to whether the conspiracy involved the importation of more than 150 kilograms of cocaine to the United States. Leal Garcia led the narcotics operations of the 10th Front for a period of years, and the business of the 10th Front was the weekly collection and processing of hundreds of kilograms of cocaine. The Court should adopt the finding of the PSR and conclude that the base offense level is 38.

### B.     Increase in Offense Level for Aggravating Role

#### 1.     Applicable Law

In determining whether a defendant was an organizer or leader in the offense, the Court must examine a number of factors and make a determination by the preponderance standard. The commentary to §3B1.1 states that:

> In distinguishing a leadership and organizational role from one of mere management or supervision . . . . the court should consider [] the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in the planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over other. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, Application Note 4.

#### 2.     Leal Garcia Was A Leader of the Charged Conspiracy

The Court of Appeals for the District of Columbia Circuit has repeatedly found defendants eligible for the four-point organizer/leader enhancement in situations where defendants exercised significantly less authority than Leal Garcia. *See, e.g., United States* v. *Brodie*, 524 F.3d 259, 269-71 (D.C. Cir. 2008) (finding four-point organizer/leader enhancement applicable to defendant who directed four other individuals in a mortgage fraud scheme on the basis of his recruitment, instruction, and payment of other participants); *United States* v. *Taylor*, 339 F.3d 973, 978-80 (D.C. Cir. 2003) (finding four-point organizer/leader enhancement applicable to defendant who supervised

6

several other individuals in a stolen check cashing scheme); *United States* v. *Yeh*, 278 F.3d 9, 13-15 (D.C. Cir. 2002) (finding four-point organizer/leader enhancement applicable to defendant who captained boat in small-scale alien smuggling operation involving five participants). Here, Leal Garcia's role and significance of his criminal activity dwarfs that of the defendants in *Brodie*, *Taylor*, and *Yeh*.

      Multiple witnesses testified that Leal Garcia was one of the leaders of the 10th Front. Witness Jose Cruz testified that as Finance Officer, Leal Garcia was part of the leadership of the Front. (8/17/11 Aft. Tr. at 52-53). Cruz also testified that Leal Garcia was a person whom he, as a younger member of the Front, went to for instruction on FARC principles and regulations. (8/17/11 Aft. Tr. at 52-53). Carlos Zuluaga-Ochoa testified that, during the time he was living in Arauca, Leal Garcia was one of the most prominent leaders of the FARC, and that in his capacity as *Financiero*, Leal Garcia was "the person who ha[d] more to do directly with the people, with the ranchers, with the farmers, with all the people in the region" than anyone else. (8/29/11 Aft. Tr. at 48-49). Francisco Novoa testified that he and many others working under Leal Garcia's direction in "mafia control" were tasked with assuring that "the farmers didn't sell coca base to anyone other than Camilo." (8/18/11 Aft. Tr. at 57-59). Yon Garzon Garzon testified that, when the members of the Rios cartel met with members of the Secretariat of the FARC, including Mono Jojoy, in furtherance of their drug operations, they were instructed at the end of the meeting that they would have to return to the Tenth Front and coordinate their plans with Leal Garcia. (8/24/11 Aft. Tr. at 35). Garzon Garzon further testified that the Rios traffickers personally delivered large sums of money to Leal Garcia. (8/24/11 Aft. Tr. at 41-44, 50 ("we were being pressured to come back quickly because El Tio was waiting for the money at the laboratory. And when we got there, Camilo was there.")). Garzon Garzon also testified that Leal Garcia periodically visited the Rios cartel's facilities and gave the members of the drug trafficking organization "orders for us to do things." (8/24/11 Aft. Tr. at 41-44). He further explained that Leal Garcia had been responsible for the rules enforced at the cocaine trafficking facilities. (8/24/11 Aft. Tr. at 53) ("after some events, they started applying very strong rules . . . [d]ue to the lack of order -- Camilo did not like the lack of order -- there were things that happened at the lab. And so they had a meeting to implement a series of rules."). Moroever, at trial the Government introduced a letter written on FARC letterhead to the ELN, a rival organization in Colombia, instructing them to back off of an individual in the area. (GX 351). The notion that a low-ranking member of the organization would be engaging in these types of communications defies credulity. This is all to say nothing of the contingent of bodyguards that surrounded Leal Garcia at all times – this fact alone is more than sufficient to warrant the four-level leadership enhancement.

      As all of this testimony and evidence makes clear (and this is only a small subset of the evidence at trial evincing the defendant's leadership role) Leal Garcia was unquestionably one of the most important leaders of the conspiracy. Indeed, during the periods when he served as *Financiero*, no one was more important to the drug trafficking of the Tenth Front. There is no serious question as to whether the Probation Department's finding is correct. The Court should impose the four-level enhancement based on Leal Garcia's important leadership role in the charged conspiracy.

C.  **Use of Weapons**

   1. **Applicable Law**

Section 2D1.1(b)(1) indicates that the offense level in a narcotics trafficking case should be increased two levels "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The Commentary to the Section indicates that "[t]he enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. **The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense**." U.S.S.G. § 2D1.1(b)(1), Application Note 3 (emphasis added).

   2. **Leal Garcia is Responsible For the Use of Weapons in Furtherance of the Conspiracy**

It is difficult, if not impossible, to conceive of a case where the weapons enhancement in Section 2D1.1 would be more applicable. The defendant acted as the boss of the drug business for hundreds of men in a faction of a narco-terrorist guerilla army. Not only was the purpose of his drug trafficking the acquisition of weapons, bullets, and other munitions, but the defendant used the threat of violence with these weapons to carry out his narcotics trafficking. Without moving through an exhaustive accounting of the witnesses' testimony, every witness who observed the defendant stated that he traveled at all times with a crew of armed bodyguards and that Leal Garcia himself was armed as he carried out his narcotics trafficking activities. Indeed, at trial, a photograph was introduced, without objection, which depicted the defendant brandishing a very large assault rifle and wearing his FARC uniform. (GX 203). Moreover, every witness who described the defendant's role as *Finaciero* testified that he was responsible for the procurement of the Front's supplies, to include weapons. *See*, *e.g.*, Testimony of Jose Cruz, 8/17/11 Aft. Tr. at 54-55 (role of Leal Garcia as *Financiero* was to do business"[t]o buy clothing, food and weapons."); Testimony of Francisco Novoa, 8/19/11 Aft. Tr. at 41 ("Q. And who was responsible for raising the money to buy weapons and ammunition for everyone in the front? A. Mr. Camilo.").

The Court of Appeals has endorsed the imposition of the weapons enhancement in infinitely more mundane situations. *See, e.g., United States* v. *Erazo*, 628 F.3d 608, 610-12 (D.C. Cir. 2011) (finding a defendant ineligible and affirming imposition of two-level firearm enhancement where defendant induced one other participant to bring a weapon to a drug deal); *United States* v. *Mathis*, 216 F.3d 18, 27 (D.C. Cir. 2000) (affirming imposition of weapons enhancement in reverse sting narcotics case where "it was foreseeable to [the defendant] that his coconspirator Smith would be carrying a firearm in view of the fact that [they] were purchasing five kilograms of cocaine for $75,000 from a stranger.").

In sum, if the enhancement is appropriately applied to a defendant who induced one other to carry a gun to a drug deal involving several grams of crack cocaine, then it unquestionably applies to an individual convicted as acting as the boss of cocaine trafficking for a violent guerilla army designated a terrorist organization by the State Department. Any finding that the Section

8

2D1.1(b)(1) enhancement was inapplicable would run counter to every facet of the case against Leal Garcia. The jury already rejected the conclusion that the defendant did not engage in drug trafficking in his capacity as a *Financiero* for the FARC. The Court should impose the two-level enhancement.

**D.    Use of Minors**

    **1.    Applicable Law**

Section 3B1.4 provides that a two-level enhancement should be applied "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. The Commentary to this Section indicates that "'used or attempted to use' includes direction, commanding, encouraging, intimidating, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4, Application Note 1. Courts have read this section of the Guidelines broadly. *See United States* v. *Robinson*, 654 F.3d 558, 562-63 (5th Cir. 2011) (affirming imposition of 3B1.4 enhancement where defendant asked fourteen year old stepsister to purchase cell phone for him and then used phone to call in bomb threat in attempt to avoid child support hearing); *United States* v. *Girod*, 646 F.3d 304, 317-18 (5th Cir. 2011) (affirming imposition of 3B1.4 enhancement where defendant used her children to help her fill out false medicare forms); *United States* v. *Cox*, 577 F.3d 833, 837 (7th Cir. 2009) (observing that " for purposes of § 3B1.4 of the Sentencing Guidelines, the Government is not required to prove a defendant's knowledge of a minor's age"); *United States* v. *Smith*, 441 F.3d 254, 271-72 (4th Cir. 2006) (affirming imposition of 3B1.4 enhancement in narcotics case where there was testimony from the defendant's son that he had delivered drugs for the defendant when he was six years old); *United States* v. *Ramsey,* 237 F.3d 853, 860-61 (7th Cir. 2001) (affirming imposition of Section 3B1.4 enhancement where nineteen year old defendant brought his sixteen year old younger brother to a drug transaction with undercover and had younger brother carry then display two ounces of crack cocaine).

    **2.    Leal Garcia is Responsible for the Use of Minor to Commit the Offense**

Witness Francisco Novoa testified that he was approximately nine years old when he joined the FARC in 1995, and that six years later he was serving under Leal Garcia's leadership in "mafia control," meaning his job was to help regulate the coca base collection business of the Front. (8/18/11 Aft. Tr. at 44, 55-59). Moreover, the Government introduced into evidence a video taken by the FARC which showed multiple young children who were participants in the 10th Front's activities, brandishing assault rifles. (GX 304, 39.09 min.). As a member of the leadership of the Front, Leal Garcia is responsible for the Front's use of these minors as well. To the extent that these children were armed and working for the FARC, they were necessarily assisting with protection of the Tenth Front's cocaine trafficking business. For both of these reasons, the Court should impose the two-point enhancement pursuant to Section 3B1.4.

## E. Section 3553(a) Factors

Here, the factors described in 18 U.S.C. § 3553(a) militate in favor of a very serious sentence for Leal Garcia. In particular, the need for general and specific deterrence, the need for the sentence to reflect the seriousness of the offense, and the need to promote respect for the law are implicated in this case. The activities of the FARC have a wide ranging effect, stretching from the areas they have terrorized in South America to the various communities affected deeply by the flood of cocaine they have supplied. Leal Garcia was a critical participant in drug trafficking that sent tons of cocaine to the United States and that funded one of the most dangerous groups in the world. This is an extraordinarily serious crime, and he engaged in it for an extended period of time. Importantly, the testimony at trial demonstrated that Leal Garcia returned to his activities with the FARC's drug trafficking after his release from prison in the late 1990s. So, although his criminal history does not reflect it, he is a recidivist. He is a person who has been involved in drug trafficking at literally the highest levels in the world. While the Government cannot request a sentence within the Guidelines range of life, the Government nevertheless encourages the Court to impose a very serious sentence in light of all of Leal Garcia's activities.

## CONCLUSION

For the foregoing reasons, the Government submits that a very significant sentence is necessary in this case to achieve the legitimate purposes of sentencing.

Respectfully submitted,

By:          /s/         .
Randall W. Jackson
Jason B. Smith
Special Assistant United States Attorneys
United States Attorney's Office for the
District of Columbia
212-637-1029

Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of this pleading was sent via ECF to defense counsel on November 14, 2011

                                      \_\_s/_____
                                      Randall Jackson